**Shenango Valley Urban League v.
Hickory Township Commissioners**

*John H. Evans, Jr.,* for appellants.

*Francis J. Fornelli,* for township commissioners.

STRANAHAN, P. J., March 5, 1973.—"It was the best of times; it was the worst of times; it was the epic of belief; it was the epic of incredulity; it was the season of light; it was the season of darkness; it was the spring of hope; it was the winter of dispair; we had everything before us; we had nothing before us . . .": Dickens, Tale of Two Cites.

These are contradictory times and, as Charles Dickens observed, we see the best of things happening but we also see the worst.

This case, the Shenango Valley Urban League v. Board of Commissioners of Hickory Township, is but one of several hundred cases that will pass through this court during the current year. This case has been filed and argued, researched and briefed by two attorneys who have great professional skill, yet this court cannot help but digress from the cited rules of law in order to comment on the real social implications that are here involved.

This case is an effort by the new and true leaders of the Negro community of Mercer County to lead the black people out of the squalid ghettoes and into a decent place to live. True, it is but a small step, but it is a beginning. What is being done represents the "best of times," "the epic of belief," "the season of light."

It is difficult for this court to believe that the very people who have cried out over the years that the Negro must accept more responsibility in the community before his social status will be on a level with that of his caucasian brother are now blocking the way.

Are these not the "worst of times"? Is this not the "epic of incredulity"? Does their action not make this the "season of darkness"?

So much for the social background. What are the facts? This court having taken testimony in the case makes the following

## FINDINGS OF FACT

1. Shenango Valley Urban League Non-Profit Housing Corporation has an office at 314 Idaho Street, Farrell, Pa. Its purpose is to provide low and moderate income housing for people.

2. By written agreement dated July 9, 1971, the housing corporation obtained from the Catholic Diocese of Erie a three-year option to buy 15.2 acres of land in Hickory Township, Mercer County, Pa., for the purpose only of the development on said land of moderate income housing under a Department of Housing and Urban Development program.

3. The said 15.2 acres of land fronts 840 feet on the north side of Mercer Avenue, has an average depth of about 740 feet and a rear line of 1,040 feet. It is bounded east by Slovak Holy Trinity Lutheran Cemetery; north by Shenango Valley Home for Senior Citizens (owned by Catholic Diocese of Erie); and west by Kennedy Christian High School (owned by Catholic Diocese of Erie).

4. The said 15.2 acres of land is in the south central part of a roughly shaped rectangle (but with a very

short east side) formed by highways and roads with Mercer Avenue (on which the land fronts) forming the south side of the rectangle; Shenango Valley Freeway forming the north side; Maple Drive on the east side; and South Buhl Farm Drive on the west side.

5. Two cemeteries occupy all of the land within the rectangle of roads east of the housing corporation site; the land and building of Shenango Valley Home for Senior Citizens occupies all of the land north of the housing corporation site up to the Shenango Valley Freeway; and the Kennedy Christian High School, stadium and vacant land south thereof account for all of the land in the rectangle of roads west of the housing corporation site except a few houses at the extreme southwest corner of the rectangle at the intersection of Mercer Avenue and South Buhl Farm Drive. Except for these few houses, there are no residences anywhere within the rectangle of roads.

6. There are no houses across, or on the south side of, Mercer Avenue. This land is entirely vacant.

7. There is an apartment complex of about 150 units north of the Shenango Valley Freeway and across from the cemeteries which are east of the housing corporation site; and west of South Buhl Farm Drive on Pine Hollow Boulevard is a mobile home park.

8. The housing corporation site is entirely vacant and topographically it is gently sloping from the north or back line down to Mercer Avenue.

9. The housing corporation's 15.2 acres of land, as well as all of the land within the rectangle formed by the roads, is located in a zoning district under the Hickory Township Zoning Ordinance called an R-1-75 district. Single-family detached dwellings is a principle permitted use in an R-1-75 district.

10. Among the sections of the ordinance dealing

with R-1 districts and appearing before those sections dealing with R-2 districts wherein multi-family housing is permitted, there is a subheading titled "42.32 Planned Residential Development" which provides in section 42.324: "Applicable Districts and Uses Permitted. Planned developments may be approved in all R-1-75, R-1-100 Residential Districts and may include the following additional uses: Multiple family dwellings, community clubs and related uses."

11. Section 42.3311 provides that an applicant shall make application for the approval of a planned development to the planning commission. At his option, the applicant may accompany his application with an outline development plan as specified in this section. Subsections 42.3311A and B state the specific items of information which constitute an outline development plan.

12. On February 10, 1972, the housing corporation filed with the Hickory Township Planning Commission an outline development plan for a planned residential development on its 15.2 acres of land on Mercer Avenue (transmittal letter in record sent to court by township).

13. Housing corporation's outline development plan, as filed, contained all of the information required by section 42.3311 of the ordinance.

14. The Hickory Township Planning Commission held a public hearing on the outline development plan of the housing corporation, and thereafter on April 11, 1972, sent the following communication to the Board of Commissioners of Hickory Township: "The enclosed outline development plan is forwarded to you with the recommendation from the Hickory Township Planning Commission that the plan be approved. The plan as submitted by the Shenango Valley Urban

League conforms to the provisions set forth in the Zoning Ordinance for a planned residential development."

15. Section 42.3312 of the ordinance provides for a joint public hearing on the plan before the board of commissioners and the planning commission and after the hearing the commissioners shall approve or disapprove the outline development plan, or approve the outline development plan with modifications.

16. On May 3, 1972, a public hearing was held before the Board of Commissioners of Hickory Township alone, and on May 31, 1972, the board of commissioners disapproved the housing corporation's outline development plan.

17. The board of commissioners issued a written "finding of fact and conclusions" dated June 1, 1972, in support of its decision of disapproval of the outline development plan. The significant stated reasons for denying approval are: paragraph 7 relating to alleged inadequate school facilities, paragraph 8 relating to alleged inadequate sewage treatment plant, and paragraph 9 relating to alleged increased traffic on Mercer Avenue.

18. The school facilities in Hickory Township are the responsibility of the Hickory Township School District, a governmental agency separate and distinct from the township government and governed by a separate code of laws.

19. The Hickory Senior High School building is overcrowded. Something should have been done about the situation this 1972-1973 school year; and the school district is definitely planning to do something about it next school year.

20. The junior high building for grades 7 and 8 has a school population that is adequate for that building.

21. The elementary schools have sufficient space.

22. Additional facilities to solve the high school problem would have been required regardless of new housing in the township.

23. It is the duty of the board of education and the superintendent to provide school facilities for such children as may live in the housing corporation's development; and it is the function of this board and the superintendent to provide schools on every level to take care of whatever children live in Hickory Township.

24. The superintendent of schools of the township was not consulted by the township officials and he did not consult with the township officials on the housing corporation's plan and its effect on school population.

25. The commissioners denied the outline development plan on May 31, 1972. At the subsequent date of June 12, 1972, the school board authorized a letter to the commissioners on the impact of new housing on school population. No member of the school board appeared at either of the public hearings on the housing corporation's plan.

26. The housing corporation has agreed to redesign the entrance road to its housing development from Mercer Avenue by dividing the road into a separate entrance road and a separate exit road divided by a solid island.

27. One entrance-exit road onto a through highway is safer than a number of such roads.

28. A residential area of a size comparable to that of the housing corporation and connected to the street system of Hickory Township by one two-way street only, which street is not separated as to entrance and exit lanes, presently exists in Hickory Township and has existed for some years without problems to police or fire vehicles.

29. The housing corporation site fronts on Mercer

Avenue midway between the intersection of South Buhl Farm Drive and Pine Hollow Boulevard on the west and the intersection of Maple Drive and Morefield Road on the east. A 1970 traffic count on Mercer Avenue was 6,500 vehicles per day and during the 19 month period January 1, 1971, through July of 1972, there were six accidents without any personal injuries at the intersection of Mercer Avenue-South Buhl Farm Drive-Pine Hollow Boulevard; and two accidents without any personal injuries at the intersection of Mercer Avenue-Maple Drive-Morefield Road, according to township's accident report.

30. The per-day traffic volume on North Buhl Farm Drive, from East State Street north, a two-lane highway, is now approximately 9,000 vehicles. The Pennsylvania Department of Highways presently proposes to repave and improve North Buhl Farm Drive as a two lane highway.

31. Mercer Avenue in its present condition, and with relation to the intersections at South Buhl Farm Drive-Pine Hollow Boulevard and at Maple Drive-Morefield Road, can handle the traffic that might be generated by the construction of 84 houses on the site of the housing corporation.

32. In 1969, the Health Department issued a citation against extension of sewers in Hickory Township.

33. On October 20, 1972, after the hearings in this case on September 5 and 8, 1972, a grant of $1,500,000 by the Federal Environment Protection Agency to the Hickory Township Municipal Authority to aid in improving the level of treatment and increasing the capacity of the Hickory Township sewage treatment plant was announced.

34. The time required for completion of construction of the treatment plant improvement is two years.

35. The housing corporation indicated to the com-

missioners in its petition for reconsideration that its schedule of need for sewer service by the township sewers would be approximately 18 months after approval of its plan by the township commissioners.

36. In July, 1972, the Hickory commissioners gave final approval to the Rakoci planned residential development without knowledge of when the treatment plan funding would be received. This was about two months after the commissioners disapproved the housing corporation plan.

37. There are public sanitary sewers in the vicinity of the housing corporation's site as follows: Along the Shenango Valley Freeway north of the site; along South Buhl Farm Drive west of the site; in the vicinity of Maple Drive east of the site; and along a small portion of Mercer Avenue east of the South Buhl Farm intersection.

38. Sewer connections with the Freeway public sewer or that in South Buhl Farm Drive are possible and would require no extension of the public sewers but would require a right-of-way over Diocese of Erie property and a lift or pump station.

39. An alternative is to tap into the existing sewer line leading from the Shenango Valley Home for Senior Citizens to the public sewer in South Buhl Farm Drive for which agreement with the management of the home and the Diocese as well as a lift station and right of way would be required.

40. A lift station or pumping system is not an engineering problem of great magnitude and the township engineer does not consider the use of such facility a reason to deny a sewer connection plan presented to him.

41. Another alternate is a line with gravity flow (no lift station) to extend eastwardly along Mercer Avenue to the public sewer east of Maple Drive. As a sewer in

a public street this plan was banned by Pennsylvania Department of Environmental Resources under the citation of 1969. But this ban may be removed with the improvement of the treatment plant.

42. The housing corporation will pay all costs of the sewer line connecting its housing development with the public sewer whatever alternative is used.

43. At the proper time, the housing corporation will present a sewer connection plan to the township and the housing corporation will be bound by the township engineer's approval or disapproval.

44. Connection of a planned residential development with the township public sewers is a general standard for such a development in the zoning ordinance, section 42.323(5). Submission of detailed sewer connection plans, however, is not a requirement of an outline development plan as submitted by the housing corporation, section 42.3311. The complete planned residential development approval procedure requires that the housing corporation shall in the future submit a preliminary development plan for approval or disapproval, section 42.3314; and also a final development plan for approval or disapproval, section 42.3315. Building permits and the accompanying sanitary permits can come only after final approval, section 42.332.

*Is planned residential development part of the Hickory zoning ordinance and, if so, is it subject to the zoning law?*

One problem in this case is to determine what planned residential development is as far as zoning is concerned. Counsel for the township argues that planned residential development is an alternative to zoning and that the land involved in this case is already subject to the restrictions of zoning as it is normally understood; but planned residential develop-

ment is not a matter of right but rather is an alternative that lies within the discretion of the township commissioners to grant or refuse, not arbitrarily, but only when conditions are proper for this type of use.

To bulwark this argument, the township points out that while the Pennsylvania Municipalities Planning Code of July 31, 1968, P. L. 805, 53 PS §10101, et seq., was enacted after the Hickory Township Zoning Ordinance, the fact remains that the Municipalities Planning Code does carry planned residential developments separate and apart from that section dealing with zoning: 53 PS §10701, et seq. Following this argument, counsel concludes that it is the intent of the legislature at the present time to consider the planned residential development as a method of land development, separate and distinct from zoning.

Counsel for the Urban League takes the position that planned residential development is merely another form of zoning and that it is subject to the established rules governing the use of zoning in a community. To support this the Urban League argues that the planned residential development section applicable in this case is a part of the Hickory Township Zoning Ordinance and, since it is integrated into that ordinance, it is obviously a part of the zoning law.

It may be, the Urban League concedes, that the legislature of the Commonwealth of Pennsylvania has now enacted statutes as a part of the Municipalities Planning Code but that is not applicable in the present case, since it did not become effective until January 1, 1969, and, therefore, it is immaterial what the legislature has done recently.

The Urban League further points out that the Municipalities Planning Code did not repeal or render ineffective the Hickory Township Zoning Ordinance even though the code did repeal the enabling zoning

provisions of the First Class Township Code. In 53 PS §10103 the Municipalities Planning Code provides, in part:

"All ordinances, resolutions, regulations and rules made pursuant to any act of Assembly repealed by this act shall continue in effect as if such act had not been repealed."

In Village 2 at New Hope, Inc., Appeals, 429 Pa. 626, the Supreme Court deals with problems that concern planned residential developments. In its introduction to that opinion, the court points out that the problem is a zoning problem and that planned residential developments are actually a new concept in zoning in which the zoning regulations focus on density requirements rather than on specific rules for each individual lot.

We feel those arguments that make planned residential developments a form of zoning based on density of population have more logic than the contention that planned residential developments are an alternative form of land development.

It has been said: "Zoning is the regulation by districts of building development and uses of property": Bettman, City and Regional Planning Papers, Harvard University Press, 1946. Planned residential developments are a new concept of land use but their purpose obviously falls within the general definition of zoning.

We, therefore, conclude initially, that the problem involved here is a zoning problem and that planned residential development is subject to the law of zoning. The basis of this type of zoning is density of population rather than lot by lot development but the concept is the same and that is the controlled use of land so as to make it beneficial to those persons living in the area.

We further conclude that, since it is zoning, it is not an alternative to zoning, and is not a type of land use which can be permitted or denied by the township commissioners on a basis different from that which the township grants permission or denies permission to use land under normal zoning law.

We next must consider whether planned residential development is similar in nature to an exception under the zoning law. It is true, as counsel for the township points out, that the court in Village 2 at New Hope, Inc., Appeals, supra, at page 641, states:

"The very essence of variances and special exceptions lies in their departure from ordinance requirements, not in their compliance with them."

We think this language is unfortunate because we do not feel that exceptions are in the same category as variances, since an exception entails a contemplated use of land whereas a variance contemplates the use of land for some other purpose than that provided in the zoning ordinance.

As was said in Devereux Foundation, Inc., Zoning Case, 351 Pa. 478, at page 483:

"An 'exception' in a zoning ordinance is one allowable where facts and conditions detailed in the ordinance, as those upon which an exception may be permitted, are found to exist."

We believe that planned residential development is in the nature of a special exception even though it may not be referred to as falling in that category.

In Root v. Erie Zoning Board of Appeals, 180 Pa. Superior Ct. 38, the court states, at page 41:

"Exact terminology is not required in zoning cases. Courts will treat the matter for what it really is, notwithstanding the terminology used."

By this the court means that it matters not whether

you call a matter a special exception or a variance, the court will treat it for what it actually is.

The use of land for a planned residential development is a use contemplated under the Hickory Township ordinance, provided the standards for this use are met. In this sense, it occupies the same position as an exception.

Such being the case, we conclude that planned residential development as it appears in this case is in the nature of a special exception under the Hickory Township Zoning Ordinance.

Counsel for the township argues that this matter is not a special exception because it does not follow the general format for special exceptions. That format is that the township commissioners, who constitute the legislative branch, establish the standards under which special exceptions will be granted and then delegate the determination of whether or not the special exceptions meet the standards to the zoning administrator. This administrator is placed in a role of making a determination of the question of whether the applied for special exceptions comply with the standards. There then is a zoning hearing board which is in the nature of a judicial body and it, in turn, settles any disputes which may arise as to whether the administrative branch has properly determined if the standards set up by the legislative branch have been met.

The township argues that such a procedure is not applicable in this particular case because the legislative branch has reserved in itself the determination of whether or not the administrative branch has properly decided if the standards have been met. In the present case, the Hickory Township Planning Commission had reviewed the plans submitted by the Urban League and found that they complied with the Hickory

Township Zoning Ordinance and recommended to the township commissioners that the plans be approved.

The zoning ordinance provided for a joint hearing by the township commissioners and the planning commission but it appears from the finding of fact that the hearing was held before the Board of Commissioners only and that this board disapproved the Urban League's plan.

Counsel for the township contends that since the legislative branch retained the right to make the final decision as to whether or not the standards had been met, this proceeding is distinguished from the normal zoning procedure and is additional evidence that this does not come under the category of a special exception and, therefore, it is not in reality zoning at all but an alternate method of land use.

We cannot agree with this, although we do admit that the normal procedure in zoning matters is for the board of adjustment to make the final determination rather than the township commissioners, who are the legislative branch of township government.

In Rathkopf, The Law of Zoning and Planning, page 54-30, the author states:

"In a great number of instances the legislative body, when enacting an ordinance providing for special exception uses in particular districts, reserves to itself the power to pass upon the application."

It would appear that there can be a situation involving special exceptions where the legislative branch of the township government performs the same function as is generally performed by the judicial branch which is commonly called the board of adjustment.

The author further continues on page 54-34, by saying:

We, therefore, conclude that even though the procedure for the issuance of a permit for a planned residential development may not follow the same procedure that is set forth for other exceptions, the fact does remain that even though the legislative branch retains its right to make the final decision, this, of itself, does not prevent the matter from being considered under the general law covering special exceptions.

*What are the standards set up by the Hickory Township ordinance and has the applicant complied with these standards?*

We are of the opinion that, since this falls in the general category of a special exception, the sole question remaining for this court to resolve is whether or not the standards set up by the township commissioners in the zoning ordinance have been complied with and further whether the refusal of the commissioners to grant the right to establish a planned residential development was arbitrarily and capriciously withheld. In Root v. Erie Zoning Board, supra, at page 42, the court states:

These standards are necessary in order to satisfy the constitutional requirement that the legislature may not delegate its power to make a law but it can make a law to delegate a power to a commission or board to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. Where the legislature establishes primary standards and then delegates to an administrative body the power to determine some fact or state of things upon which it makes or intends to make its own action depend, it is the legislature which has legislated and not the administrative body."

It is fundamental law in zoning that there must be

certain standards set forth which control the question of whether a variance or an exception will be granted. The zoning ordinance obviously cannot permit one person to use land for a certain use and deny that right to another person unless the standards are adopted and the person denied the right does not meet the standards.

What are the standards that are required under the Hickory Township Zoning Ordinance? In section 42.323, the general standards governing planned residential developments are set forth and in section 42.3311 additional requirements are stated for the applicant.

It apparently is admitted by everyone that the Urban League has complied with these standards, since the planning commission examined the information submitted and recommended to the township commissioners that these standards had been met.

It is also true that there are certain standards set forth in section 12 of the zoning ordinance which are general in nature but are controlling. These standards indicate that the zoning plan is adopted for the protection and promotion of the public health, safety, and welfare in the township.

Since the Urban League has complied with the standards set forth in section 42.32, et seq., it would appear to this court that the sole question for it to decide is whether or not the township commissioners could refuse the Urban League on the basis that the planned residential development was detrimental to the public health, safety, and welfare of the community.

Considerable amount of the testimony in this case was aimed at this question since the township produced evidence that there was overcrowding in the schools, that there was an insufficient highway in the

area of the planned residential development and, therefore, traffic congestion would occur, and finally that the sewers in the township were inadequate.

We are not impressed by any of the township's arguments. We are far more impressed with the philosophy set forth in National Land and Investment Company v. Easttown Township Board of Adjustment, 419 Pa. 504, where the court states, at page 528:

"Zoning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future."

The argument advanced by the Urban League that the mere fact the township commissioners permitted an ordinance to be in effect, which provided for planned residential development in and of itself, is some evidence that the refusal to allow the planned residential development because it placed an additional burden on the schools, highways and sewers, is not an argument made in good faith. The mere fact that this type of land used is contemplated under the statute is indicative of the fact that the commissioners do not feel that such a use cannot be permitted in the township. If it were otherwise, then why was the ordinance permitting planned residential developments enacted and allowed to remain as a part of the zoning code. The very existence of this type of zoning is evidence that the township commissioners were aware that traffic would be increased, the school population would be increased, and the burden on the sewers would be increased. If the commissioners felt that this would create the disaster that they contend would happen, then why was the concept of planned residential developments permitted to remain on the books?

In Archbishop O'Hara's Appeal, 389 Pa. 35, some of the same questions regarding the impact that an

increase of population in an area would have on a community are discussed.

At page 53, the court says:

"The ordinance which classifies this area as 'AA' residential district specifically provides that land situated therein may be used for 'educational, religious, and philanthropic' purposes. The use of the land for any such purpose would naturally result in an increase of traffic and the framers of this ordinance certainly must have taken heed of this factor in the preparation of the ordinance."

In regard to the increased traffic conditions, we have examined the testimony offered by the township, including the number of accidents that have occurred in the immediate area; and, including the fact that a high school is located nearby which has a tendency to cause increased traffic, we must admit that we are not inclined to believe that the additional traffic caused by this development would be such that it would endanger the welfare or safety of those persons in the area. We find this as a matter of fact. Admittedly, there are inadequate roads and traffic counts can be produced which might indicate that there is a need for an expanded highway, yet this court is of the opinion that many of the highways in this county are in need of expansion and we cannot hold up progress awaiting four-lane highways. Care must be used, of course, in the area to avoid traffic accidents but we believe that this matter can be accomplished by establishing the speed limits which are appropriate to the situation and proper policing of the area in order to impress upon the residents that care must be used in the operation of their motor vehicles. The same is true with people who are on foot. There is testimony that few, if any, stores are located in the general area and that there may be a problem of the

residents getting to the stores, yet that problem in this day and age is not one of too much concern, since travel is easy and people are accustomed to a trip to the supermarket.

We now turn our attention to the question of schools. The testimony in this case would indicate that the senior high school building in Hickory Township is overcrowded and that it is necessary that something be done immediately to remedy that situation. The junior high facilitates the population for grades 7 and 8 which fits the building, although, apparently, there is some question as to what would happen if grade 9 were moved down into that building. The elementary schools are capable of holding the present number of pupils.

There is testimony on the record that there is a need for expansion in the Hickory Township schools regardless of whether the planned residential development contemplated by the Urban League is approved or not. It is common knowledge that Hickory Township is a growing community and, like all growing communities, the schools have been taxed.

The contemplated planned residential development in this case will not cause an immediate increase in the student population, because it is quite apparent that this project will be some time in building. This should afford an opportunity for the school district to make plans for the increase in population that may be caused by this project as well as other contemplated building projects in the township. We reiterate our thoughts that we have already expressed in the discussion of the traffic conditions by saying that the mere fact that the population of a community is growing does not give cause for the local government to hide behind a zoning ordinance in order to prevent the expansion of population. Zoning should not be used

as a method of maintaining the status quo but rather should be used for the purpose for which it is intended; and that is the orderly arrangement of living conditions.

Finally, we turn our attention to the sewer problem which exists in Hickory Township. There is evidence in this case that a grant of $1,500,000 by the Federal Environmental Protection Agency to the Hickory Township Municipal Authority to aid in the improving of the level of treatment and increasing capacity of the Hickory Township Sewer Treatment Plant has been made. What effect this may have on the overall problem is questionable but it obviously will offer at least a partial solution. In 1969, the Health Department served the township with a citation. This citation indicated that the sewage plant facilities were determined to be inadequate by the State and a ban has been put on significant sewer extensions.

This court is of the impression from a review of the testimony that the sewage situation in Hickory Township is a cause of considerable concern to the township government but it has not as yet reached a position of affecting the health and welfare of the people. The proposed plan of the Urban League is to use existing sewers rather than require an extension of the sewage system and, therefore, such use would be permissible under the citation.

As we pointed out in our discussion of the school situation, the building of this rather sizable development will not be done overnight but will take a rather extended period of time. Therefore, the increased sewage is not a matter of immediate concern but rather is a matter which calls for immediate planning. If the Hickory sewage system is overtaxed, then the questions arise as to whether any additional sewage connections should be allowed. This is an impractical

284

solution because there is considerable building going on in the township, both commercial and residential, which must have sewage. The solution obviously is to take the necessary steps to remedy the situation and the $1,500,000 grant is certainly an encouraging sign that the necessary steps are being taken. We again find as a matter of fact that the sewage situation is not such in Hickory Township; this project should be denied.

## ORDER

And now, March 5, 1973, the decision of the Board of Commissioners of Hickory Township refusing approval to the outline development plan of the Shenango Valley Urban League, a nonprofit housing corporation, is reversed and it is ordered and directed that the Board of Commissioners of Hickory Township shall approve the outline development plan under the planned residential sections of the zoning ordinances of Hickory Township as presented by the Shenango Valley Urban League, a nonprofit housing corporation.

It is further ordered that exceptions are granted to the Board of Commissioners of Hickory Township to all findings of fact, conclusions of law and the order of this court.